RECEIVED
CIRCUIT COURT FOR
BALTIMORE CITY

2019 AUG 30  AM 9: 36

CIVIL DIVISION

KARL ROGERS                                        *
125 MARINE CIRCLE
OCEAN CITY, MARYLAND  21842         *      IN THE

and                                                *      CIRCUIT COURT FOR

JAMES JARDINA                               *      BALTIMORE CITY
HARBOR HOSPITAL
3001 S. HANOVER STREET                  *
BALTIMORE, MARYLAND  21225
                                                   *      CASE NO.

and                                                *      24.C.19.004580

VINCENT BERRY                              *
DORSEY RUN CORRECTIONAL FACILITY
2020 TOULSON ROAD
JESSUP, MARYLAND  20794                 *

and                                                *

LARRY COLEMAN                           *
DORSEY RUN CORRECTIONAL FACILITY
2020 TOULSON ROAD                        *
JESSUP, MARYLAND  20794                 *

and                                                *

JOHN FISHBACK                             *
DORSEY RUN CORRECTIONAL FACILITY
2020 TOULSON ROAD                        *
JESSUP, MARYLAND  20794                 *

and                                                *

ERIC ANDRE YOUNG                       *
DORSEY RUN CORRECTIONAL FACILITY
2020 TOULSON ROAD                        *
JESSUP, MARYLAND  20794                 *

        Plaintiffs                                  *

v.                                                  *

MARYLAND DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONAL SERVICES

ROBERT L. GREEN                          *
O. WAYNE HILL
JAMA ACUFF                                 *

Case: 24-C-19-004580
CV File New
                                  $50.00
RIF-New Case
                                  $30.00
Appear Fee
                                  $20.00
MISC
                                  $55.00
TOTAL                  $165.00

Receipt #2019000019466
Cashier: CD CCBOX82
08/30/19  12:05pm

[1]


EXHIBIT
1

RICHARD J. GRAHAM                              *
CAROLYN J. SCRUGGS
CASEY CAMPBELL                                 *

        SERVE ON:                              *
        Michael O. Doyle, Assistant Attorney General
        Deputy Counsel                         *
        Office of the Attorney General
        Department of Public Safety and        *
         Correctional Services
        200 Saint Paul Place                   *
        Baltimore, Maryland  21202
                                               *
and
                                               *
STEPHEN T. MOYER                               *
126 FIELDSTONE DRIVE
VENICE, FLORIDA  34292                         *

                                               *
and
                                               *
DAYENA CORCORAN                                *
4000 CYPRESS GROVE WAY, APT. 507
POMPANO BEACH, FLORIDA  33069                  *

        Defendants                             *

*       *       *       *       *       *      *       *       *       *       *       *

## COMPLAINT AND DEMAND FOR JURY TRIAL

        Plaintiffs Karl Rogers, James Jardina, Larry Coleman, Vincent Berry, John Fishback, and

Eric Andre Young ("Plaintiffs"), by their undersigned counsel, hereby file this Complaint and

Demand for Jury Trial against Defendants Maryland Department of Public Safety and Correctional

Services, Robert L. Green, Stephen T. Moyer, O. Wayne Hill, Dayena Corcoran, Jama Acuff,

Casey Campbell, Richard J. Graham, Jr., and Carolyn J. Scruggs (collectively the "Defendants"),

and state in support:

[2]

## INTRODUCTION

The Maryland Department of Public Safety and Correctional Services ("DPSCS") consistently violates the laws protecting prisoners with disabilities and perceived disabilities. These ongoing violations exclude Maryland prisoners from numerous DPSCS programs, services, and activities, and cause them to suffer the humiliation, indignity, inhumanity, and difficulties that accompany such exclusion. Plaintiffs bring this action to redress DPSCS's widespread pattern and practice of statutory and constitutional violations against prisoners with disabilities.

## PRELIMINARY STATEMENT

1.     Plaintiffs bring this action to challenge the acts and omissions of DPSCS and its agents and employees, for: (1) discriminating against them because they are disabled and/or because of a perceived disability; (2) failing to properly make available and administer the administrative grievance process; (3) subjecting Plaintiffs to conditions of confinement that have caused, and continue to create a substantial risk of harm; and (4) depriving Plaintiffs of the right to equally participate in and benefit from DPSCS programs, services, and activities.

2.     The Eighth and Fourteenth Amendments to the United States Constitution along with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, require Defendants to (1) provide the necessary and reasonable modifications and ancillary aids and services that would allow Plaintiffs to freely and safely access facilities, and (2) ensure that qualified prisoners with disabilities have the right to equally participate in and benefit from prison programs, services, and activities.

## BACKGROUND

3.     Plaintiffs Karl Rogers, DOC ID #469800, James Jardina, DOC ID #418567, Larry Coleman, DOC ID #451342, Vincent Berry, DOC ID #455176 (hereinafter the "Wheelchair Plaintiffs"), are wheelchair-bound prisoners currently or formerly residing at the Dorsey Run

Correctional Facility ("DRCF")—a DPSCS prison facility—which is located at 2020 Toulson Road, Jessup, Maryland 20794.

4.    Plaintiffs John Fishback, DOC ID #304325 and Eric Andre Young, DOC ID #469775 (hereinafter the "Non-Wheelchair Plaintiffs"), are prisoners with disabilities or perceived disabilities who are currently housed at DRCF.

5.    DPSCS places prisoners at DRCF when those prisoners have medical conditions that require more intensive care than can be provided in a general population setting at other DPSCS institutions.   However, Defendants deny (or denied) Plaintiffs access to vital safety equipment and features necessary for Plaintiffs to safely reside in DRCF and take advantage of DRCF's programs, services, and activities.

6.    Defendants have harmed and continue to harm Plaintiffs by failing to make the necessary and reasonable accommodations and modifications, and by failing to provide ancillary aids and services that would allow Plaintiffs to freely and safely access DPSCS facilities, services, and programs.  For example, the following is a non-exhaustive list of what the Defendants do not provide to the Plaintiffs: (1) the ADA-required accommodations in DRCF's bathroom and shower facilities, requiring Plaintiffs to hop in and out of the showers on wet floors, or teeter precariously on plastic chairs in the showers because there are no handicap benches or shower hoses; (2) ADA-required accommodations in DRCF's housing units, including bed rails, grab bars, and accessible shelving and storage; (3) ADA-required furniture and other equipment suitable to accommodate Plaintiffs' disabilities; (4) ADA-required accommodations for wheelchair-bound individuals to allow Plaintiffs to access the entire facility, such as properly graded ramps, sidewalks, and pass-through areas in hallways; (5) access to work release programs solely because of Plaintiffs' disabilities; (6) ADA-compliant housing accommodations with proper disabled prisoner-to-bed ratios; and (7) access to the same employment opportunities within DPSCS, resulting in Plaintiffs

being unable to earn diminution of confinement credits in the same manner as similarly situated non-disabled individuals incarcerated at DRCF and within DPSCS. As a result, Plaintiffs are exposed to a substantial risk of injury on a daily basis. Indeed, Plaintiffs have sustained personal injuries because of Defendants failures to provide necessary and reasonable accommodations. Further, these ongoing failures embarrass, dehumanize, and degrade Plaintiffs.

7.     Defendants have also harmed and continue to harm Plaintiffs by not affording them an opportunity to equal enjoyment of the benefits and opportunities available to the non-disabled prisoner population. For example, Plaintiffs are unable to participate in valuable activities, like the work release program. Consequently, Plaintiffs are unable to earn wages and gain valuable job experience, both of which are available to non-disabled inmates. Plaintiffs also risk violating the terms of their parole because they are unable to satisfy the work release conditions therein. Moreover, Defendants discriminate against Plaintiffs because of Plaintiffs' disabilities in the administration of various work programs, job training, and other ancillary benefits that allow non-disabled prisoners to receive vocational training, earn wages, and obtain credits towards their release. As a result, Plaintiffs are at a substantial financial and educational disadvantage, both during their respective terms of confinement and upon release, when compared to their non-disabled counterparts.

8.     Defendants have denied Plaintiffs their due process rights. Defendants have failed to establish minimum mandatory standards for administrative complaints and grievances as required by Md. Code, Corr. Servs. § 8-103, and Md. Code Regs. 12.14.04.05, violating Plaintiffs' Fourteenth Amendment rights to access the courts.

9.     Plaintiffs seek injunctive relief, compensatory and punitive damages, attorneys' fees and costs, and any other available relief.

## PARTIES

10.     Plaintiff Karl Rogers, formerly #469800, was a prisoner committed to the custody of the DPSCS. Mr. Rogers, a single-leg amputee, is a wheelchair-bound individual and is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2). Mr. Rogers was released from DPSCS custody in May 2019. During his incarceration with DPSCS, Mr. Rogers was housed at the Maryland Reception, Diagnostic and Classification Center ("MRDCC") in Baltimore, and at DRCF. Mr. Rogers currently resides in Ocean City, Maryland.

11.     Plaintiff James Jardina, formerly #418567, was a prisoner committed to the custody of the DPSCS. Mr. Jardina is a wheelchair-bound individual and is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2). Mr. Jardina was mysteriously released from DPSCS custody in June 2019, after DPSCS conceded that it could not accommodate Mr. Jardina's ongoing and serious medical needs. During his incarceration with DPSCS, Mr. Jardina was housed at several DPSCS facilities, including the Western Correctional Institution ("WCI") and DRCF. Mr. Jardina currently resides in Baltimore, Maryland.

12.     Plaintiff Larry Coleman, #451342, at all times relevant to this action, was and is a prisoner committed to the custody of the DPSCS. Mr. Coleman is a wheelchair-bound individual and is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2). During his incarceration with DPSCS, Mr. Coleman has been housed at several DPSCS facilities including WCI and DRCF. Mr. Coleman currently resides at DRCF.

13.     Plaintiff Vincent Berry, #455176, at all times relevant to this action, was and is a prisoner committed to the custody of the DPSCS and assigned to DRCF. Mr. Berry is a wheelchair-bound individual and is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2). Mr. Berry currently resides at DRCF.

14.     Plaintiff John Fishback, #304325, at all times relevant to this action, was and is a prisoner committed to the custody of the DPSCS. Mr. Fishback suffers from bipolar disorder and chronic pain and is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2). During his incarceration with DPSCS, Mr. Fishback has been housed at several DPSCS facilities including WCI and DRCF. Mr. Fishback currently resides at DRCF.

15.     Plaintiff Eric Andre Young, #469775, at all times relevant to this action, was and is a prisoner committed to the custody of the DPSCS. Mr. Young was diagnosed with asthma as a child and is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2). Mr. Young currently resides at DRCF.

16.     Defendant Department of Public Safety and Correctional Services ("DPSCS") is established as a principal department of the State of Maryland pursuant to Maryland Code, Correctional Services ("CSA") § 2-101. The Maryland Division of Corrections ("DOC") is a unit of the Department, CSA § 2-201, organized to incarcerate certain criminal defendants sentenced by Maryland courts. The DOC is tasked with operating and overseeing Maryland's twenty-four (24) state prison facilities, including DRCF, MRDCC, and WCI.

17.     Defendant Robert L. Green is the current Secretary of DPSCS. The Secretary of DPSCS is the primary administrator of the Department and is responsible to the Governor. CSA § 2-102. Defendant Green is aware of DPSCS's policies and practices regarding disabled prisoners. Mr. Green is also knowledgeable of the requirements of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated within DPSCS. Defendant Green is named in this action in his individual and official capacities.

18.     Defendant Stephen T. Moyer is the former Secretary of DPSCS, holding that position from 2015 through 2019. As Secretary, Mr. Moyer was aware of DPSCS's policies and

[7]

practices regarding disabled prisoners. Mr. Moyer is also knowledgeable of the requirements of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated within DPSCS. Defendant Moyer is named in this action in his individual and official capacities.

19.     Defendant O. Wayne Hill is the Acting Commissioner of Corrections at DOC (the "Commissioner"). The Commissioner is responsible for the administration of DPSCS and is responsible to the Secretary of DPSCS and the Governor for the supervision of prisoners and correctional staff. CSA §§ 3-203 *et seq.* The Commissioner's responsibilities also include responding to appeals of complaints and grievances brought by individuals in the Department's custody. As the Commissioner, Mr. Hill is aware of DPSCS and DOC policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities. The Commissioner is also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at DRCF. Defendant Hill is named in this action in his individual and official capacities.

20.     Defendant Dayena Corcoran is the former Commissioner of Corrections at DOC. As Commission, Ms. Corcoran responsibilities also include responding to appeals of complaints and grievances brought by individuals in the Department's custody. As Commissioner, Ms. Corcoran was aware of DPSCS and DOC policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities or perceived disabilities. As Commissioner, Ms. Corcoran was also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at DRCF. Defendant Corcoran is named in this action in her individual and official capacities.

21.    Defendant Jama Acuff is the warden of DRCF and is responsible for the governance, discipline, and policies of that institution. CSA § 3-211. In addition, Warden Acuff is responsible for the enforcement of DPSCS regulations and directives. Warden Acuff is the legal custodian of all individuals incarcerated at DRCF and is responsible for their safe, secure, and humane treatment. Warden Acuff is aware of DPSCS's policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities or perceived disabilities. Warden Acuff is also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at DRCF. Warden Acuff is aware of the complaints brought by wheelchair-bound prisoners and prisoners with other disabilities at DRCF regarding failure to properly establish and or follow proper administrative grievance procedures, as well as Plaintiffs' complaints regarding safety concerns at DRCF's inadequate facilities and inaccessible programming. Defendant Acuff is named in this action in her individual and official capacities.

22.    Defendant Casey Campbell is the former warden at DRCF. In that role, Mr. Campbell was responsible for the governance, discipline, and policies of that institution. CSA § 3-211. In addition, Mr. Campbell was responsible for the enforcement of DPSCS regulations and directives. As warden, Mr. Campbell was the legal custodian of all individuals incarcerated at DRCF and was responsible for their safe, secure, and humane treatment. As warden, Mr. Campbell was aware of DPSCS's policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities or perceived disabilities. As warden, Mr. Campbell was also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at DRCF. As warden, Mr. Campbell was aware of the

complaints brought by wheelchair-bound prisoners and prisoners with other disabilities at DRCF regarding failure to properly establish and or follow proper administrative grievance procedures, as well as Plaintiffs' complaints regarding safety concerns at DRCF's inadequate facilities and inaccessible programming. Defendant Campbell is named in this action in his individual and official capacities.

23.     Defendant Richard J. Graham, Jr. is the warden at WCI and is responsible for the governance, discipline, and policies of that institution. CSA § 3-211. In addition, Warden Graham is responsible for the enforcement of DPSCS regulations and directives. Warden Graham is the legal custodian of all individuals incarcerated at WCI and is responsible for their safe, secure, and humane treatment. Warden Graham is aware of DPSCS's policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities or perceived disabilities. Warden Graham is also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at WCI. Warden Graham is aware of the complaints brought by wheelchair-bound prisoners and prisoners with other disabilities at WCI regarding failure to properly establish and or follow proper administrative grievance procedures, as well as Plaintiffs' complaints regarding safety concerns at WCI's inadequate facilities and inaccessible programming. Defendant Graham is named in this action in his individual and official capacities.

24.     Defendant Carolyn J. Scruggs is the warden of MRDCC and is responsible for the governance, discipline, and policies of that institution. CSA § 3-211. In addition, Warden Scruggs is responsible for the enforcement of DPSCS regulations and directives. Warden Scruggs is the legal custodian of all individuals incarcerated at MRDCC and is responsible for their safe, secure, and humane treatment. Warden Scruggs is aware of DPSCS's policies and practices regarding

prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities or perceived disabilities. Warden Scruggs is also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at MRDCC. Warden Scruggs is aware of the complaints brought by wheelchair-bound prisoners and prisoners with other disabilities at MRDCC regarding failure to properly establish and or follow proper administrative grievance procedures, as well as Plaintiffs' complaints regarding safety concerns at MRDCC's inadequate facilities and inaccessible programming. Defendant Scruggs is named in this action in her individual and official capacities.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over the above-captioned Defendants, pursuant to Maryland Code, Courts & Judicial Proceedings ("CJP"), §§ 6-102 and 6-103, as through their acts, Defendants caused the tortious and constitutional injuries herein described in the State of Maryland, and because they transact business in the State of Maryland, contract to perform services in the State of Maryland, and through their acts and the acts of their agents, caused the tortious and constitutional injuries herein described.

26.    Venue is proper in Baltimore City, pursuant to CJP § 6-201 as Defendant DPSCS carries on regular business therein, and because part of the harms alleged herein arose in Baltimore City.

27.    This Court has subject matter jurisdiction over this matter, pursuant to CJP §§ 1-504 and 4-401, as the amount in controversy exceeds Thirty Thousand Dollars ($30,000.00).

## STATEMENT OF FACTS

### DPSCS' Systemic Violations of Laws Protecting People With Disabilities

28.     DPSCS systematically violates the laws protecting persons with disabilities and perceived disabilities in its custody.  This includes but is not limited to prisoners who are blind, deaf, hard of hearing, and have mobility impairments.  This also extends to prisoners who DPSCS perceives as disabled, but are not.  DPSCS has violated, and continues to violate, the ADA, Rehabilitation Act, Eighth Amendment, Due Process Clause, and the Maryland Declaration of Rights in the following ways.  This is not an exhaustive list:

   a.   Failure to maintain wheelchair accessible facilities;

   b.   Failure to provide and maintain wheelchairs and assistants;

   c.   Failure to allow and maintain prosthetic devices;

   d.   Exclusion from jobs and programs;

   e.   Engaging in retaliation and interference against prisoners who are disabled and/or who file grievances about noncompliant DPSCS activities;

   f.   Refusing to answer meritorious grievances and complaints;

   g.   Failure to train personnel and private contractors on the requirements of federal disability laws;

   h.   Failure to properly assign prisoners to jobs, programs, and other services based on their commitment status and security level; and

   i.   Failure to provide adequate medical treatment and devices to prisoners with disabilities;

   j.   Failure to provide addiction treatment counseling;

   k.   Failure to provide medication withdrawal counseling or programming;

l.  Failure to engage competent medical service providers to oversee and administer the

healthcare needs of prisoners committed to the custody of DPSCS;

m.  Failure to provide ADA-compliant housing accommodations with proper prisoner-to-

bed ratios; and

n.  Failure to provide safe and habitable living environments for disabled individuals by

overcrowding housing facilities, improperly ventilating and cooling its housing units,

and by failing to keep the housing units free from hazards that interfere with disabled

prisoners' abilities to safely move about the institution.

29.   Plaintiffs are each qualified individuals with a disability, in that they, with or

without reasonable modifications to rules, policies, or practices; the removal of architectural,

communication, or transportation barriers; or the provision of auxiliary aids and services; meet the

essential eligibility requirements for the receipt of services of the participation in programs or

activities provided by DPSCS.

30.   DPSCS knows that the Plaintiffs are qualified individuals with disabilities.

31.   All Plaintiffs have, by reason of their disability, been excluded from participation

or have been denied the benefits of DPSCS services, programs, or activities, or have been subjected

to discrimination by DPSCS.

32.   The events described herein are not isolated incidents; they are but some examples

of DPSCS's failure to comply with the laws protecting individuals with disabilities.

33.   These violations will continue unless enjoined by this Court.

### Prisoners With Mobility Impairments

#### *Karl Rogers*

34.   Mr. Rogers was incarcerated in the DPSCS between 2018 and 2019, and spent time

at both MRDCC and DRCF.  Mr. Rogers is a single-leg amputee and requires a prosthetic or other

[13]

assistive devices to ambulate. This physical impairment substantially limits one or more major life activities, including but not limited to walking. Upon his commitment to DPSCS in December 2018, Mr. Rogers was refused a prosthetic or wheelchair and was instead offered forearm crutches for mobility. Ultimately, DPSCS provided Mr. Rogers with a wheelchair nearly two months after he was committed to DPSCS custody.

35. *Failure to Provide and Maintain Wheelchairs and Assistants.* Mr. Rogers resided in the Harford County Detention Center as he awaited sentencing and was provided a wheelchair in that facility. Upon arriving at MRDCC in December 2018, DPSCS and MRDCC denied Mr. Rogers the ability to enter that institution with a wheelchair and instead offered him forearm crutches. On or about January 3, 2019, Mr. Rogers fell in the shower facilities at MRDCC. MRDCC does not have handicapped accommodations whatsoever. For example, MRDCC does not have handicapped showers, handrails, anti-slip guards, or shower chairs for disabled prisoners, like Mr. Rogers. Consequently, MRDCC staff forced Mr. Rogers to **hop on one leg** in and out of the shower facilities on wet floors. MRDCC staff also refused to allow Mr. Rogers to bring his forearm crutches or any other assistive devices into the shower with him, despite the patent risk of harm. Ultimately and after several weeks of this practice, Mr. Rogers slipped and fell as he hopped out of the shower and seriously injured his right shoulder. Mr. Rogers raised concerns to MRDCC staff many times before his fall, but those complaints were ignored.

36. After falling, Mr. Rogers filed a formal grievance with the warden of MRDCC, complaining of the lack of handicap accessibility, both in the shower areas and elsewhere in the institution, including in his assigned cell. This grievance went unanswered.

37. Within days of this fall, DPSCS transferred Mr. Rogers from MRDCC to DRCF, which DPSCS represented to be a fully ADA-compliant facility. At DRCF, staff again refused to provide Mr. Rogers with a prosthetic, but did request that a wheelchair be provided to Mr. Rogers.

[14]

38.     Shortly after his arrival at DRCF, Mr. Rogers' forearm crutches broke in front of a DPSCS sergeant.  That sergeant contacted a lieutenant who then asked the medical department to provide Mr. Rogers with new crutches.  The sergeant also asked the medical department for an update on the status of Mr. Rogers' wheelchair.

39.     After approximately one week—during which time Mr. Rogers had to borrow another prisoner's wheelchair to access food, medical services, and the lavatory, DPSCS provided Mr. Rogers with a wheelchair.  This wheelchair, however, was only designed for indoor use.  However, DRCF's facilities required Mr. Rogers to travel outside of his housing unit to access every basic service, like food, medication, and the library.

40.     The DPSCS-provided wheelchair routinely broke and needed maintenance.  For example, the hardware that secured the brakes to the wheelchair came loose and made slowing or stopping the wheelchair very difficult.  Mr. Rogers could not tighten the hardware on his own, which made traveling in the wheelchair hazardous.  DRCF also failed to provide Mr. Rogers with a "pusher," a prisoner designated to assist and push a wheelchair-bound prisoner.  Mr. Rogers advised the medical department of these concerns and the medical staff stated that they had informed maintenance staff.  However, neither maintenance staff nor DRCF medical staff ever responded to this concern.  Mr. Rogers ultimately had to rely on friendly maintenance workers— when he could find them—to repair his wheelchair.

41.     During his time at DRCF, Mr. Rogers saw several old or broken wheelchairs on the prison grounds being used by other prisoners.

42.     Importantly, Mr. Rogers does not require a wheelchair to ambulate, but DPSCS forced Mr. Rogers to remain wheelchair-bound for his entire stay at DRCF by failing to provide him with a prosthetic or working crutches.

43.   *Failure to Maintain Wheelchair Accessible Facilities.*  DPSCS institutions are not wheelchair accessible, despite DPSCS' claims to the contrary. Upon his arrival at DRCF and after DPSCS finally provided Mr. Rogers with a wheelchair, he had significant difficulty with even the most basic activities of daily living because of DRCF's lack of handicap accessibility.

44.   On or about March 31, 2019, Mr. Rogers filed a formal grievance at DRCF, complaining of insufficient and non-ADA compliant housing accommodations, shower and toilet facilities, accessible common areas, recreational activities and opportunities, dining accommodations, and visiting room accommodations. Mr. Rogers noted in his grievance that these complaints posed a continued threat to his health, safety, and welfare.

45.   Specifically, Mr. Rogers complained that: (a) there was no shower hose, grab rails, or adjustable shower seats in DRCF's shower facilities; (b) the designated handicapped toilet was not the appropriate height; (c) the handicapped housing unit did not have enough space between the beds for wheelchair-bound prisoners to safely navigate; (d) doorways were not cut wide enough to safely allow wheelchair access; (e) the exercise area was on a slope and contained loose flat rocks making wheelchair access impossible; (f) the tables in the dining and visiting rooms were too low and not handicap accessible; (g) the handicap housing unit contained many more wheelchair-bound prisoners than its design safely allowed (i.e. twenty-four prisoners in the housing unit, twenty of whom were confined to wheelchairs); and (h) there was only one handicap accessible bathroom for approximately sixty prisoners, both handicapped and otherwise.

46.   *Failure to Provide Jobs and Other Programming.*  DPSCS refused to provide a job to Mr. Rogers for his entire term of confinement, despite his being eligible and medically cleared for same. Mr. Rogers repeatedly requested that DRCF case managers provide him with a job so that he could earn money, earn diminution credits, and occupy his time with substantive work like

[16]

non-disabled prisoners at DRCF.  Instead, Mr. Rogers was forced to sit idle each day for several months, while his non-disabled peers enjoyed the benefits of prisoner job assignments.

47.     *Engagement in Retaliation and Interference.*  Mr. Rogers and the other prisoners who use wheelchairs have been subjected to unfair harassment that interferes with their equal access to DPSCS programs, services, and activities.  For instance, the ARP coordinator at DRCF expressly told Mr. Rogers to stop filing grievances about the facility's ADA noncompliance or else he would be punished.

48.     *Failure to Reinstate Health Insurance Upon Release.*  Prior to his DPSCS commitment, Mr. Rogers had Medicare insurance coverage for both medical and hospitalization services.  DPSCS cancelled Mr. Rogers' Medicare medical coverage upon his commitment because DPSCS has a policy of enrolling incoming prisoners in the state Medicaid program.  Upon Mr. Rogers' release, however, DPSCS failed to ensure that his Medicare medical coverage was reinstated.

49.     ~~DPSCS has opted to provide medical care to its prisoners by selecting, through a~~ competitive bidding process, a private, for-profit company with which DPSCS contracts to render medical care and services at State prisons, including DRCF, MRDCC, and WCI.  This contractual arrangement is based on "capitated financing," whereby the medical contractor sets up a pricing schedule that fluctuates monthly based on the average headcount of all prisoners committed to DPSCS.  Under this capitated financing scheme, the contractor bears the full risk that health care costs may exceed the per prisoner price dictated by the pricing schedule in the contract.  The medical contractor using the capitated system receives a fixed amount of money per prisoner, and its profit increases as the cost of care it provides to the prisoners decreases, regardless of how much or how little care is provided to the prisoners.

50.     DPSCS promulgates standard operating procedures for the provision of health care within its prisons, including those prisons, like DRCF, MRDCC, and WCI, where health care services are rendered by private contractors.  The private contractors have their own procedures, but must also follow DPSCS' procedures.

51.     The warden at any DPSCS prison is the highest ranking DPSCS official at the facility.  The warden has authority over all staff, including medical personnel.  Even where there is a private medical contractor, the warden remains ultimately responsible for the operation of the facility, including health care treatment and security.  DPSCS determines the medical accommodations prisoners may receive, and medical staff have no authority to override DPSCS criteria.

52.     Importantly here, DPSCS requires its private medical contractors to screen all incoming prisoners for Medicaid eligibility and to apply for Medicaid benefits where available. DPSCS incentivizes its private medical contractors by offering them a percentage of any Medicaid reimbursements for medical care while committed to DPSCS custody.

53.     DPSCS, through its agent and private medical contractor, determined that Mr. Rogers was Medicaid-eligible upon his commitment to DPSCS confinement.  DPSCS enrolled Mr. Rogers in the Medicaid program to ensure that DPSCS and/or its private medical contractor was reimbursed for any medical services rendered to Mr. Rogers during his term of confinement.  This enrollment occurred without Mr. Rogers' knowledge or consent.  This enrollment canceled Mr. Rogers' Medicare eligibility and caused Medicare to discontinue his medical coverage.  Upon his release, DPSCS failed to ensure that Mr. Rogers' Medicare coverage was reinstated, and also failed to refer Mr. Rogers to a regional social work supervisor for assistance with reinstating the Medicare coverage.

[18]

54.     DPSCS's failures compounded Mr. Rogers' already serious medical issues in several meaningful ways. First, Mr. Rogers was left without any health insurance upon release. Second, Mr. Rogers could not seek medical attention for his severely injured right shoulder, which he sustained when he fell in the MRDCC shower.  Not only did DPSCS fail to provide any meaningful medical care to Mr. Rogers for this injury during his confinement, but DPSCS also ensured that Mr. Rogers could not seek medical care upon his release without paying for same out of his own pocket.

55.     Mr. Rogers repeatedly asked DPSCS for assistance with this issue, but was denied each time.  In fact, Mr. Rogers brought this issue to the attention of his case manager, social worker, and DRCF medical staff prior to his release, but each refused to provide any assistance.

56.     Mr. Rogers ultimately purchased private health insurance, at a cost of $170.00 per month, because being without health coverage is not an option for Mr. Rogers.

*James Jardina*

57.     James Jardina was incarcerated in DPSCS from approximately 2015 through 2019, until his mysterious release in June 2019. On information and belief, DPSCS released Mr. Jardina after his repeated grievances and complaints concerning DPSCS and DRCF's failure to properly accommodate his disability. As a result of medical complications, Mr. Jardina is confined to a wheelchair.  He relies on an ileostomy bag to relieve himself and requires ongoing medical care for his conditions.  His mobility issues substantially limit several major life activities, including but not limited to walking and caring for himself.  Mr. Jardina's disabilities are clearly documented in his medical and administrative records maintained by DPSCS.  DPSCS has full knowledge that Mr. Jardina is disabled and requires accommodations.

58.     *Failure to Maintain Wheelchair Accessible Facilities.*  Mr. Jardina resided in at least two DPSCS facilities, WCI and DRCF.  Each facility has features that are inaccessible to

wheelchair users.  WCI is almost entirely inaccessible to a wheelchair-bound individual.  DRCF, as described herein, is similarly inaccessible.

59.   Mr. Jardina filed numerous grievances with the wardens of WCI and DRCF, and sent additional complaints to DPSCS concerning the inaccessibility of WCI and DRCF.

60.   For example, on or about May 30, 2017, Mr. Jardina filed a formal grievance with DRCF's former warden, Casey Campbell, complaining that DRCF failed to accommodate his needs by:  (a) maintaining a noncompliant grading on its walkways making it difficult to navigate in his wheelchair; (b) constructing hallways that are too narrow; (c) failing to install grab bars or hand rails in his bunk; (d) maintaining noncompliant bathroom and shower facilities; (e) refusing him access to case management services and other programming; (f) refusing him access to work release jobs; and (g) refusing him access to "offsite" family visits for up to forty-eight hours, as was offered to non-disabled prisoners.

61.   On or about May 15, 2017, former warden Campbell responded to Mr. Jardina's grievance in writing and dismissed it without merit.  Mr. Campbell stated that DRCF is "well within compliance," that "bed rails and/or grab bars on the beds are not an ADA requirement," that DRCF does not exceed the ratio of prisoners to handicap bathrooms, that the DRCF showers do not require a shower hose, that DRCF was not obligated to place a certain size bench in the handicap shower, and that Mr. Jardina's claims concerning disabled prisoners being denied jobs was unsubstantiated.

62.   During his time at WCI and DRCF, Mr. Jardina was not afforded any privacy when using the handicapped shower stall.  This stall is in the plain view of other prisoners and guards and there is no privacy screen.

63.   The dining halls at WCI and DRCF have insufficient seating for wheelchair users.  Prisoners with disabilities must wait, sometimes outside without cover, until a seat is available for

their wheelchair.  Once inside, a wheelchair-bound prisoner cannot pull him or herself all the way up to a table because the tables are not designed to accommodate wheelchairs.  Prisoners with disabilities must wait longer to eat than able-bodied prisoners.

64.     At WCI and DRCF, Mr. Jardina was excluded from activities on the yard.  The facilities offer only a cement sidewalk or track with a weight pit area in the middle.  The walking track is sloped and difficult for a wheelchair-bound prisoner to safely navigate, especially with wheelchairs that are in desperate need of maintenance.  The ground of the weight pit is made of loose materials that are unsafe and unable to accommodate a wheelchair.  The able-bodied prisoners can enjoy basketball and other recreational activities, while the wheelchair-bound prisoners are severely limited.

65.     Although Mr. Jardina worked in the library at DRCF, he had to fast during the day because DRCF does not have a handicap accessible bathroom for prisoners on the west side of the facility where the library sits.  To use a bathroom, Mr. Jardina would have to push himself outside for hundreds of yards back to his housing unit.  The DRCF library area actually has a handicap accessible bathroom, but it is designated only for staff, and prisoners are not permitted to use that facility.

66.     *Failure to Provide or Maintain Wheelchairs and Assistants.*  Mr. Jardina is a six foot five, two hundred eighty pound wheelchair-bound individual who requires a wheelchair to ambulate.  During his time at WCI in 2015, DPSCS refused to provide Mr. Jardina with his own wheelchair, despite several available wheelchairs at the facility.  In May 2015, WCI medical staff ordered that Mr. Jardina be provided with a wheelchair, but failed to personalize a wheelchair for him.  Because of Mr. Jardina's size, he requires modifications to a standard issue wheelchair to ensure his safety.  Consequently, the wheelchair provided to Mr. Jardina was too small, uncomfortable, and was in need of several modifications to properly roll.

67.   WCI staff assigned an untrained prisoner as Mr. Jardina's wheelchair attendant. Because Mr. Jardina's attendant was not trained, he pushed Mr. Jardina outside in the rain from his housing unit to the medication area.  During that excursion, the right front wheel broke off of Mr. Jardina's wheelchair as it went over cracks and uneven pavement on the walkway.  The attendant lost his footing, and Mr. Jardina was thrown from his wheelchair and landed on the ground. Mr. Jardina hit his head on the concrete and lost consciousness.  He also injured his back, neck, left hand, and left wrist.

68.   Mr. Jardina filed a grievance with the WCI warden, and received a response stating that the cracked and uneven pavement did not cause the injury.  Instead, WCI attributed this incident to "normal wear and tear of the wheelchair."  Yet WCI delayed in repairing Mr. Jardina's wheelchair.  WCI also failed to personalize or assign a wheelchair to Mr. Jardina that could be tailored to his individual needs.  WCI further failed to train prisoner attendants or to modify its medication administration routine such that wheelchair-bound prisoners, like Mr. Jardina, did not have to navigate the elements—especially with untrained wheelchair attendants—simply to obtain their medication.

69.   When he arrived at DRCF, Mr. Jardina continued to experience difficulties in having his wheelchair repaired, having replacement parts ordered, and navigating the DRCF compound in the same way as his non-disabled counterparts.

70.   *Engaging in Retaliation or Interference.*  Mr. Jardina has filed numerous grievances in an effort to improve his conditions of confinement, and as a result has been repeatedly threatened by DPSCS staff.  While at WCI, DPSCS staff would routinely denigrate Mr. Jardina and threaten to transfer him to an even less ADA compliant facility if he continued his complaints.  This practice continued at DRCF, with DRCF staff threatening Mr. Jardina almost on a daily basis because he assisted many other disabled prisoners with their grievances.  Both facilities also routinely delayed

[22]

providing Mr. Jardina with the necessary medical equipment he required to use his ileostomy bag. The stress of having a disability while incarcerated caused Mr. Jardina tremendous anxiety, embarrassment, and humiliation, and caused Mr. Jardina to go without necessary and essential medical and physical accommodations.

71.    Despite his numerous grievances about objectively verifiable and meritorious matters, WCI, DRCF, and DPSCS have dismissed each of Mr. Jardina's grievances as lacking merit. This practice demonstrates DPSCS's willful ignorance of patently obvious issues in its facilities. Further confirmation of DPSCS's retaliatory treatment exists in its response to Mr. Rogers' grievance, which raised the identical concerns about DRCF's noncompliant facilities as Mr. Jardina raised in his myriad grievances. Warden Acuff **confirmed** that many facilities at DRCF are not ADA compliant. Specifically, Warden Acuff identified the following noncompliant features at DRCF: the bathrooms, showers, lack of grab bars and hand rails, bathroom to prisoner ratio, weight pit access, resurfacing complaints, table heights, and door sizes. Ironically though, Warden Acuff issued her response after both Messrs. Rogers and Jardina were released from DPSCS custody. To date, DPSCS has not modified any of the identified noncompliant features at DRCF.

### Larry Coleman

72.    Larry Coleman has been incarcerated at DRCF since December 2018. Mr. Coleman requires a wheelchair to ambulate after a spinal cord injury in 1990. His mobility issues substantially limit several major life activities, including but not limited to walking and caring for himself. Mr. Coleman's disabilities are clearly documented in his medical and administrative records maintained by DPSCS. DPSCS has full knowledge that Mr. Coleman is disabled and requires accommodations.

[23]

73.    *Failure to Provide or Maintain Wheelchairs and Assistants*. DPSCS transferred Mr. Coleman from WCI to DRCF in December 2018. At WCI, Mr. Coleman had a wheelchair that his family provided to him. Upon his transfer, DRCF refused to permit Mr. Coleman to use his own wheelchair at the facility. Instead, DRCF told Mr. Coleman that he would have to use a wheelchair provided to him by DRCF. Mr. Coleman advised DRCF staff that his personal wheelchair was already fitted to him to accommodate his specific needs. DRCF ignored this fact and provided Mr. Coleman with a wheelchair designed only for indoor use. This wheelchair was too small for Mr. Coleman, was not fitted to Mr. Coleman, was in poor condition, and was not designed for outside use. Mr. Coleman must travel outside of his housing unit to access every basic service, like food, medication, and the library. DRCF nevertheless told Mr. Coleman that this was his only option. Consequently, Mr. Coleman has been confined to a wheelchair that cannot accommodate his needs since his arrival at DRCF, and remains in that chair to date. Mr. Coleman's wheelchair is in shoddy condition and routinely breaks, but DRCF fails to repair or replace the wheelchair.

74.    DRCF also refused to provide Mr. Coleman with a "pusher" to assist him in navigating around the large DRCF facility.

75.    *Failure to Maintain Wheelchair Accessible Facilities*. Mr. Coleman adopts and incorporates the previous paragraphs as if fully stated herein.

76.    DPSCS institutions are not wheelchair accessible, despite DPSCS' claims to the contrary. Upon his arrival at DRCF, Mr. Coleman had significant difficulty with even the most basic activities of daily living because of DRCF's lack of handicap accessibility.

77.    Mr. Coleman has also filed formal grievances with DRCF advising of that facility's noncompliance, and also advising DRCF and DPSCS administrators that he has fallen in the shower. To date, neither DRCF nor DPSCS have adequately responded to these grievances,

instead telling Mr. Coleman that his complaints are unfounded because DRCF is an ADA-compliant facility.

78.    *Failure to Provide Jobs and Other Programming*.  Mr. Coleman arrived at DRCF in December 2018, and was medically cleared for a job on January 12, 2019.  However, DRCF refused to provide a job to Mr. Coleman until April 23, 2019.  During these months without a job, Mr. Coleman lost diminution credits that he should have earned based on his classification status and security level.  It was not until Mr. Coleman submitted a formal grievance to DRCF that he was assigned a job.

79.    *Engagement in Retaliation and Interference*.  Mr. Coleman and the other prisoners who use wheelchairs have been subjected to unfair harassment that interferes with their equal access to DPSCS programs, services, and activities.  For instance, medical and case management staff at DRCF have repeatedly told Mr. Coleman that he will be transferred back to a western Maryland prison if he continues to complain about DRCF's ADA noncompliance.

*Vincent Berry*

80.    Mr. Berry has been incarcerated at DRCF since approximately 2016.  Mr. Berry is a paraplegic prisoner who is confined to a wheelchair.  He has no use of his legs and requires a wheelchair to ambulate.  His mobility issues substantially limit several major life activities, including but not limited to walking and caring for himself.  Mr. Berry's disabilities are well documented in his medical and administrative records maintained by DPSCS.  DPSCS has full knowledge that Mr. Berry is disabled and requires accommodations.

81.    *Failure to Maintain Wheelchair Accessible Facilities*.  As previously stated regarding Messrs. Rogers and Jardina, DRCF is not an ADA compliant facility.  Mr. Berry experiences the same difficulties and exclusions as previously described.

[25]

82.     Mr. Berry has also filed formal grievances with DRCF advising of that facility's noncompliance, and also advising DRCF and DPSCS administrators that he has sustained several injuries after falling in the shower. To date, neither DRCF nor DPSCS have adequately responded to these grievances, instead telling Mr. Berry that his complaints are unfounded because DRCF is an ADA compliant facility.

83.     Mr. Berry also suffers from DRCF's refusal to provide him with necessary medical equipment. For example, Mr. Berry requires routine replacement medical supplies, like single catheters, gloves, and underpads, but DRCF fails to provide him with the necessary provisions. This leaves Mr. Berry without the ability to properly or safely tend to his medical needs in a sanitary manner and causes Mr. Berry tremendous humiliation and embarrassment. Mr. Berry also requires periodic maintenance to his wheelchair, but DRCF refuses to make those accommodations. DRCF's failures in these areas leaves Mr. Berry at a significant disadvantage as compared to his non-disabled peers.

84.     Mr. Berry must instead rely on his family to call the wheelchair manufacturer and request that it visits DRCF and repairs Mr. Berry's wheelchair. The only time that DRCF assisted Mr. Berry in contacting the wheelchair manufacturer, that company billed Mr. Berry for the repair costs.

85.     *Failure to Provide Jobs and Other Programming.* Mr. Berry arrived at DRCF in 2016 and was medically cleared for a job assignment shortly thereafter. However, DRCF has refused to provide a job to Mr. Berry since his initial commitment. This has, and continues to disadvantage Mr. Berry because he cannot earn money or diminution credits, and he is instead forced to sit idle all day. Mr. Berry is thus treated differently than his non-disabled counterparts solely because of his disability.

## Prisoners With Non-Mobility Impairments

### John Fishback

86.     *Work Release and Employment at DRCF.*  Mr. Fishback is currently incarcerated at DRCF, but has spent significant time in DPSCS institutions since 2002.  Mr. Fishback suffers from bipolar disorder, which was diagnosed at approximately age eleven.  DPSCS, through its private medical contractor, has prescribed psychotropic medications to Mr. Fishback for this condition.  In approximately 2004, DPSCS, through its agents, volunteered Mr. Fishback for an experimental shoulder replacement surgery.  This procedure left Mr. Fishback disabled and with a chronic pain condition in his left shoulder.  For this chronic condition, DPSCS, through its agents, has prescribed non-opioid pain medication (Tramadol) to Mr. Fishback for more than ten years.  Without this medication, Mr. Fishback is in constant and intractable pain.

87.     Throughout his time in DPSCS custody, Mr. Fishback has taken his Tramadol as prescribed and without issue.  Indeed, he has relied on this medication to relieve his chronic pain condition and to provide him with a basic quality of life.

88.     In May 2019, DPSCS granted Mr. Fishback parole in December 2019, provided that he met certain conditions.  Mr. Fishback is also eligible for the Home Detention Unit ("HDU") as of October 2019.

89.     In order for Mr. Fishback to qualify for HDU and for transitional housing—which he has already secured—upon his release, he must work so that he can save enough money to pay for these transitional facilities.  However, since arriving at DRCF in 2019, DPSCS and DRCF have refused to provide Mr. Fishback with a job.

90.     Moreover, upon his transfer to DRCF, Mr. Fishback's classification status and security level was reduced to pre-release—a status that entitles him to work release and other privileges.

91.     Although DPSCS prisoners can work in the institutions during their incarceration, that employment only pays $0.90 to $2.75 per day.  By contrast, work release employment pays prisoners regular wages.  Maryland's current minimum wage is $10.10 per hour.

92.     As a pre-release prisoner, Mr. Fishback is entitled to work release programs, provided that he is medically cleared by DPSCS and its agents.  However, since his arrival at DRCF, DPSCS and its agents have systematically denied Mr. Fishback any opportunity to engage in HDU or work release programming.  DPSCS and its agents identify Mr. Fishback's Tramadol prescription as the sole reason for his inability to work.  According to DPSCS's agents and medical personnel, Mr. Fishback's status as a chronic pain patient with a valid prescription issued by DPSCS precludes him from being able to participate in work release programs.

93.     Worse yet, DRCF has refused to offer Mr. Fishback any job at all since his arrival at that facility.  Instead, Mr. Fishback must sit idle all day.  He is not able to earn even the nominal daily wage available to his non-disabled peers.

94.     Mr. Fishback has filed formal grievances about this issue and discussed the matter with his case manager at DRCF.  In response, DRCF advised Mr. Fishback that DPSCS policy prohibits him from participating in work release because he takes Tramadol.  According to DPSCS and DRCF, Mr. Fishback can only obtain the requisite medical clearance for work release if he stops taking Tramadol.

95.     In response, and seeing that DPSCS and DRCF explicitly conditioned his ability to work on discontinuing Tramadol, Mr. Fishback reluctantly stopped taking his Tramadol prescription.  He consulted with DRCF medical staff and advised them that he was only choosing this route because of the ultimatum placed on his work release.

96.     Mr. Fishback then discontinued his Tramadol prescription over a two week period. Mr. Fishback endured this painful and psychologically disturbing process alone and without

assistance from DPSCS or DRCF.  In fact, DPSCS and DRCF do not offer programming or

services for prisoners who are discontinuing prescription pain medications. Mr. Fishback endured

horrible withdrawal symptoms as he tapered off of his Tramadol.  He also suffered serious

psychological side effects from this process.  Mr. Fishback asked his case manager for addiction

counseling or any assistance to soften the effects of this process, but no such services are available

at DRCF; and if they are, they were not made available to Mr. Fishback.

97.    DRCF and DPSCS, through its agents, assured Mr. Fishback that once he

discontinued the Tramadol, he would be eligible for work release.  Mr. Fishback felt trapped,

coerced, and thought that this was the only way to obtain work release opportunities.  Once he

discontinued the Tramadol, Mr. Fishback was in excruciating pain and unable to perform many

basic activities of daily living.

98.    However, Mr. Fishback has not been provided with work release opportunities even

after he discontinued the Tramadol.  In fact, DPSCS has advised Mr. Fishback that it removed

work as a condition of his parole.  Upon learning that work release would never be made available

to him even though he is eligible for same, Mr. Fishback resumed his Tramadol prescription.

99.    Moreover, DRCF still refuses to assign Mr. Fishback any work whatsoever, even

within the facility.  Consequently, Mr. Fishback is at a significant disadvantage, especially when

compared with his non-disabled peers, in that he cannot earn money, cannot work, and cannot

access programs and services for which he is otherwise eligible.

100.    In order for Mr. Fishback to satisfy the terms of his release from DPSCS

incarceration, he must find transitional housing that will accept him upon his release.  Without

this, Mr. Fishback cannot satisfy the terms of his release and risks remaining in prison for the

remainder of his sentence.

101.   On July 10, 2019, Mr. Fishback obtained preliminary approval from The Way Homes, a faith-based transitional housing facility in Pasadena, Maryland. This facility sent a letter to Mr. Fishback's case manager at DRCF advising that Mr. Fishback was approved for the program and that he would be expected to pay a down payment of $350.00 before moving in. Thereafter, Mr. Fishback must pay this facility $175.00 per week as rent.

102.   Because DPSCS and DRCF are precluding Mr. Fishback from working—both at DRCF and on a work release program—Mr. Fishback cannot earn the money he needs to pay for his transitional housing and risks being unable to satisfy the terms of his release. Consequently Mr. Fishback is disadvantaged, as compared to his non-disabled peers, solely because of his disability.

### *Eric Andre Young*

103.   Mr. Young is currently incarcerated at DRCF. Mr. Young is an asthmatic and was diagnosed with that condition as a child. Upon his arrival at DRCF in 2019, Mr. Young was classified as being eligible for outside work detail and work release programs. DPSCS and its agents performed the requisite medical clearance evaluation to authorize Mr. Young's inclusion in these programs and confirmed, *inter alia*, that Mr. Young could lift more than fifty pounds. However, DPSCS and its agents nevertheless deemed Mr. Young ineligible for outside detail and/or work release because of his asthma diagnosis.

104.   Mr. Young sought reconsideration of this decision with his case manager at DRCF. However, the case manager advised Mr. Young that it is the policy of DRCF and DPSCS to prohibit prisoners with asthma, like Mr. Young, from outside work detail and/or work release programs.

105.   Mr. Young filed a formal grievance with DRCF, but DRCF has not responded to that grievance.

106.   Because DPSCS and DRCF are precluding Mr. Young from assignments for which he is eligible solely because of his asthma diagnosis, Mr. Young cannot access the same opportunities, services, and programs as his non-disabled peers.

### The DRCF Facility

107.   DRCF is a minimum security correctional facility located in Jessup, Maryland and is under the control of DPSCS and DOC.  The facility was opened in 2013 and houses more than 500 male prisoners at any time.  Defendants allege that the DRCF is an ADA-compliant facility with the ability to house wheelchair-bound individuals and individuals with other disabilities.

108.   DRCF serves as a transitional facility for prisoners preparing for release.  Many of the prisoners housed at DRCF are assigned to outside work details and have other job assignments and programming opportunities to aid in their transition.  Some of these assignments are required as terms of the prisoners' parole.

109.   In conjunction with its work release program, DRCF offers resumé workshops, vocational training, and other programs that allow prisoners to receive diminution credits.  Each diminution credit correlates to a one day reduction in a prisoner's sentence.  A prisoner may earn five industrial credits each month during which he satisfactorily completes work assignments.  Additionally, a prisoner may earn up to ten credits each month in which he shows satisfactory progress in special work projects or programs selected by the Commissioner and approved by the Secretary of DPSCS.  Work assignments also provide valuable vocational training for re-entry.

110.   DRCF houses numerous wheelchair-bound individuals.  Approximately twenty-four (24) wheelchair-bound prisoners reside in Housing Unit 1-C (the "Housing Unit")—an allegedly ADA-compliant housing unit within DRCF.  As such, DRCF is required to make reasonable accommodations to allow wheelchair-bound prisoners equal access to its facilities, programs, services, and activities.

111.   Additionally, DRCF is obligated to comply with the 2010 Standards for Titles II and III Facilities:  2004 ADAAG ("ADA Standards"), published by the Department of Justice. The ADA standards set forth specific building requirements, such as the maximum allowable slope for wheelchair-access ramps and the required safety features in DRCF's handicap-accessible bathrooms.  The 2010 standard for State and local governments consists of Title II regulations at 28 C.F.R § 35.151 and the 2001 ADAAG at 36 C.F.R. § 1191, appendices B and D.

112.   DRCF's facilities fail to meet the standards required by the ADA 28 C.F.R § 35.151.  Specifically, DRCF fails to provide an adequate number of accessible mobility cells pursuant to (§ 35.151(k)).  Further, DRCF fails to comply with ADA Standards by failing to provide passing spaces in its hallways (§ 403.5.3), wheelchair-accessible shower and bathroom facilities (§§ 603-10, 903), grab bars in appropriate locations (§ 609), adequate wheelchair-accessible ramps throughout the facility (§ 405), and other features in the cells and housing units (§ 807).

113.   DRCF also fails to provide the requisite ratio of shower and bathroom facilities to its disabled prisoner population, as required by Md. Code Regs. 12.02.03.06 (4) and (6).

## CLAIMS FOR RELIEF

### COUNT I

**(42 U.S.C. §§ 12101-12165, 12202-12213—Discrimination Against Plaintiffs Because of Actual or Perceived Disabilities in Violation of the American With Disabilities Act)**
**(Against All Defendants)**

The previous paragraphs are incorporated as if fully set forth herein.

114.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

115.    Public entities may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service" they provide, nor may they afford such individuals "an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(i)-(ii). Further, public entities may not provide a qualified individual with an "aid, benefit, or service that is not as effective in affording equal opportunity" to gain a result or benefit and from "limit[ing] a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." *Id.* § 35.130(b)(1)(iii), (vii).

116.    The ADA prohibits public entities from imposing "eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." *Id.* §

35.130(b)(8).  A public entity may "impose legitimate safety requirements necessary for the safe

operation of its services, programs, or activities . . . based on actual risk, not on mere speculation,

stereotypes, or generalizations about individuals with disabilities." *Id.* at 35.130(h).

117.    Public entities' administration of their facilities and policies may not "have the

effect of subjecting qualified individuals with disabilities to discrimination on the basis of

disability." *Id.* § 35.130(b)(3).

118.    Public entities are required to "make reasonable modifications in policies, practices,

or procedures when the modifications are necessary to avoid discrimination on the basis of

disability unless the public entity can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity." *Id.* § 35.130(b)(7)(i).

119.    Title VI of the ADA prohibits discrimination against individuals for "oppos[ing]

any act or practice made unlawful" by the ADA.  42 U.S.C. § 12203(a).  It also prohibits the

retaliation against, or the interference, coercion, or intimidation by any individual who has opposed

or assisted in the opposition of an act or right granted protection by the ADA.  *See* 42 U.S.C. §

12203.

120.    DPSCS's administrative grievance process, work programs, educational programs,

diminution of confinement credits, and facilities are services, programs, or activities under 42

U.S.C. § 12132.

121.    Plaintiffs are individuals with disabilities, or perceived disabilities, currently

residing at DRCF.  Plaintiffs are "qualified individuals with a disability" as contemplated in Title

II of the ADA, 42 U.S.C. § 12131(2).

122.    Defendants are departments, agencies, and instrumentalities of the State of

Maryland, or representatives, agents, and employees of those entities, and are public entities as

defined in the ADA.  12 U.S.C. § 1231(1)(B).

[34]

123. As prisoners committed to the custody of DPSCS, Plaintiffs are entitled to participate in and receive benefits of these services, programs, and activities.

124. Defendants have a pattern and practice of coercing, intimidating, threatening, and/or interfacing with prisoners' exercise or enjoyment of their ADA rights, and doing so because prisoner have exercised or enjoyed their ADA rights or aided and encouraged others to do so.

125. Defendant uses eligibility criteria that either explicitly or tacitly screen out prisoners with disabilities.

126. Defendant fails to maintain in operable working condition the features required for programs, services, and activities to be readily accessible to prisoners with disabilities.

127. Defendants have denied, and continue to refuse Plaintiffs equal access to and benefits from DPSCS's services, programs, and activities because of Plaintiffs' disabilities or perceived disabilities. Defendants discriminate against Plaintiffs by failing to make reasonable accommodations to DPSCS facilities that would allow Plaintiffs to safely access those facilities and participate in the services, programs, and activities made available to other non-disabled prisoners. Defendants have unfairly denied equal access to DPSCS's work release programs because of Plaintiffs' disabilities. Retaliation by Defendants' and their agents and employees against Plaintiffs for filing grievances and complaining about DPSCS's noncompliant facilities also constitutes discrimination against Plaintiffs because of their disabilities.

128. Defendants' administration of housing assignments and security classifications has the effect of subjecting Plaintiffs to discrimination on the basis of their disabilities and substantially impairs the objectives of the prisoner housing program by subjecting Plaintiffs to exploitation, safety hazards, and neglect. Defendants fail to house prisoners in the most integrated setting appropriate to their needs; places prisoners in facilities that do not offer the same

programming as other facilities; and deprives prisoners with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

129.    Defendants have retaliated against Plaintiffs by revoking or restricting their privileges, harassing them, threatening to confiscate their property, placing them in inappropriate housing assignments based on their security classification levels and/or their disability-related needs, and summarily rejecting their grievances and complaints.

130.    On information and belief, Defendants' ongoing ADA violations have also caused Plaintiffs to serve longer terms of confinement than non-disabled prisoners solely because of their disability or perceived disability. Specifically, Defendants' noncompliant policies limit the jobs available to Plaintiffs because of their disabilities, making Plaintiffs unable to earn diminution of confinement credits in the same way as their non-disabled peers.

131.    Plaintiffs are also routinely denied appropriate and timely medical care, follow up treatment, and medical supplies. Specifically, the Wheelchair Plaintiffs are not provided with supplies or parts for their wheelchairs, ileostomy bags, and other necessary devices to accommodate their disabilities. This practice has resulted in the Wheelchair Plaintiffs being unable to repair their wheelchairs when necessary, or to use the bathroom in a safe and sanitary manner, and has caused them to suffer embarrassment, humiliation, and tremendous physical and emotional discomfort.

132.    The Non-Wheelchair Plaintiffs have medical conditions—the need for prescriptions pain medication and an asthma diagnosis—which DPSCS and DRCF uses as excuses to refuse them access to outside detail and/or work release programs. These Non-Wheelchair Plaintiffs have made formal complaints to DPSCS and DRCF but have been denied and/or ignored. Therefore, the Non-Wheelchair Plaintiffs cannot access the same opportunities, services, and programs as their non-disabled peers.

[36]

133. For example, for Mr. Fishback to qualify for HDU and for transitional housing (which he has already secured a commitment) upon his release, he must work so that he can save enough money to pay for these transitional facilities. However, since arriving at DRCF in 2019, DPSCS and DRCF have refused to provide Mr. Fishback with an institutional job or work release based solely on his Tramadol prescription.

134. Mr. Fishback is a chronic pain patient with a valid prescription issued by DPSCS. According to DPSCS and DRCF, Mr. Fishback can only obtain the requisite medical clearance for work release if he stops taking Tramadol.

135. After DRCF and DPSCS, through its agents, coerced Mr. Fishback by assuring him that once he discontinued the Tramadol, he would be eligible for work release, he went off the medication. He experienced withdrawal symptoms, including excruciating pain and was unable to perform many basic activities of daily living. DPSCS and DRCF do not offer programming or services for prisoners who are discontinuing prescription pain medications. Mr. Fishback asked his case manager for addiction counseling or any assistance to soften the effects of this process, but was refused treatment.

136. After all this and two weeks of withdrawal, DPSCS still refused to provide Mr. Fishback with work release opportunities. Upon learning that work release would never be made available to him even though he is eligible for same, Mr. Fishback resumed his Tramadol prescription. Mr. Young's asthma has been similarly used against him by DPSCS.

137. Therefore, the Non-Wheelchair Plaintiffs are disadvantaged, as compared to their non-disabled peers, solely because of their disabilities.

138. The Wheelchair Plaintiffs also have no privacy during their medical appointments because of Defendants' noncompliance. For example, the Wheelchair Plaintiffs do not enjoy the same partition or privacy wall/curtain during their medical visits because DRCF is not designed to

[37]

adequately accommodate wheelchairs in the medical unit. This causes the Wheelchair Plaintiffs to lose their medical privacy and their confidentiality in the doctor/patient relationship.

139. Similarly, the Wheelchair Plaintiffs have no privacy when using the bathroom because of Defendants' noncompliance. As previously described, DRCF lacks the proper ratio of handicap accessible bathrooms to prisoners, causing disabled prisoners to use other bathrooms that are not designed to accommodate their needs.

140. The Wheelchair Plaintiffs also suffer from having no access to recreational programs and services that are available to non-disabled prisoners. For example and on information and belief, the weight pit at DRCF is filled with loose material that cannot accommodate a wheelchair. As a result, the Wheelchair Plaintiffs cannot access weight or exercise equipment that is made available to non-disabled prisoners.

141. Similarly, the Wheelchair Plaintiffs cannot reasonably access each part of the DRCF facility, including the handicapped bathrooms, the medication department, or the dining areas because the Defendants have failed to ensure that the walkways and pavement at DRCF are properly graded. Moreover, the Wheelchair Plaintiffs must travel outside and navigate the elements when moving from their housing unit to other parts of DRCF. This damages the Wheelchair Plaintiffs' wheelchairs, and neither DRCF nor DPSCS address these ongoing needs. As a result, the Wheelchair Plaintiffs cannot access services and facilities that are made available to non-disabled prisoners.

142. Defendants' refusal to make reasonable modifications to DPSCS facilities by providing ADA-required safety features has subjected Plaintiffs to discrimination on the basis of their disability. Defendants' failure to make reasonable modifications to DPSCS's work release programs has excluded Plaintiffs from participating in the work release program on the basis of Plaintiffs' disabilities.

143.     Plaintiffs have suffered physical injuries and are regularly exposed to dangerous conditions as a result of Defendants' refusal to make reasonable modifications to DPSCS facilities. Because of Defendants repeated and ongoing violations, Plaintiffs must routinely place themselves in situations that are highly likely to cause significant injuries or have already caused significant injuries as a result of Defendants' noncompliant bathrooms, showers, cells, access ramps, and other services and facilities.  Plaintiffs have also suffered physical and emotional injuries because of Defendants' failure to provide addiction counseling and drug detoxification programs.

144.     Plaintiffs have suffered damages in the form of lost wages, lost diminution credits, and a lack of vocational training from Defendants' failure to make reasonable modifications to DPSCS policies.  Plaintiffs are unable to participate in DRCF's work release program to earn wages, nor do they receive vocational training due to their disabilities.  Plaintiffs are also not able to participate in off-site trips because DPSCS and DRCF have repurposed the ADA-compliant transportation vehicles to carry ammunition to and from various DPSCS firing ranges.  Indeed, several officers and case managers at DRCF have advised the Wheelchair Plaintiffs that the only way for them to leave the facility is "by release or by death."

145.     Defendants continue to house Plaintiffs and other disabled prisoners in noncompliant prison facilities without providing reasonable modifications to the facility by adding the safety features required by the ADA.  Accordingly, Plaintiffs and other disabled prisoners are exposed to a substantial risk of injury—a risk that routinely materializes into actual physical injury.

146.     Defendants continue to operate its prison facilities under explicit or tacit policies that exclude Plaintiffs and other disabled prisoners from important educational, vocational, and other vital programs that are intended to both satisfy the minimal constitutional baseline concerning conditions of confinement, and to ease prisoners' transition from incarceration and back into the community.

147.    For example, Defendants remove or otherwise cancel Plaintiffs' health insurance upon their initial commitment to DPSCS.  However, Defendants either do not have a policy, or fail to follow a policy if it exists, to assist Plaintiffs in resuming their health insurance upon their release from incarceration.  This practice has resulted, *inter alia*, in Plaintiff Rogers, being unable to obtain necessary medical care (for serious physical injuries sustained during his incarceration with DPSCS) because he cannot reactivate his private health insurance and had no assistance upon his release from DPSCS regarding same.

148.    As a result, Plaintiffs are significantly disadvantaged upon their release from incarceration, especially as compare to their non-disabled peers, because Plaintiffs have a host of medical and emotional issues with which to contend—all caused or exacerbated by Defendants' noncompliance.

149.    Defendants' discrimination against Plaintiffs and failure to comply with the ADA will continue to put Plaintiffs at a severe disadvantage upon release and expose Plaintiffs to situations that are likely to cause substantial harm.  Plaintiffs will continue to be harmed unless Defendants make the reasonable modifications required by the ADA.

150.    Defendants are firmly aware of the myriad violations noted herein, but have failed to correct them, thus exhibiting deliberate indifference to the rights of Plaintiffs and those similarly situated in DPSCS custody.

151.    Defendants' pattern, practice, and deliberate indifference as described herein has proximately caused harm to individuals with disabilities in DPSCS custody, and Plaintiffs have suffered, and continue to suffer from harm and violations of their ADA rights.  These harms will continue if not enjoined by this Court.

152.    Accordingly, Plaintiffs are entitled to compensatory damages and such other and further relief as demanded herein.

[40]

## COUNT II

### (29 U.S.C. § 794 Discrimination Against Plaintiffs Because of Disability In Violation of Section 504 of the Rehabilitation Act)

### (Against All Defendants)

The previous paragraphs are incorporated as if fully set forth herein.

153.   Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

154.   Section 504 defines "[p]rogram or activity as" "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." *Id.* § 794(b)(1)(A)-(B). The requirements of Section 504 apply "to each recipient of Federal financial assistance from the Department of Justice and to each program or activity receiving such assistance." 28 C.F.R. § 42.502.

155.   A recipient of federal funding may not "[d]eny a qualified handicapped person the opportunity accorded others to participate in the program or activity receiving Federal financial assistance" or "[d]eny a qualified handicapped person an equal opportunity to achieve the same benefits that others achieve in the program or activity receiving Federal financial assistance." *Id.* § 42.503(b)(i)-(ii). Further, federally funded programs are prohibited from denying "a qualified handicapped person an equal opportunity to participate in the program or activity by providing services to the program." *Id.* § 42.503(iv).

[41]

156.    Entities receiving federal funding must "administer programs or activities in the most integrated setting appropriate to the needs of qualified handicapped persons." *Id.* § 42.503(d). The entity is prohibited from "purposely or in effect discrimin[ating] on the basis of handicap, defeat or substantially impair accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons, or perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State." *Id.* § 42.503(b)(3).

157.    Defendants employ more than 15 individuals and, by way of operating every Maryland state prison, including DRCF, WCI, and MRDCC, receive federal grants and funding to administer these facilities. Accordingly, Defendants must follow the mandates of Section 504.

158.    Defendants have a pattern and practice of excluding qualified individuals with disabilities, like Plaintiffs, from participating in and enjoying the benefits of programs, services, or activities, solely because of their disabilities. Such pattern and practices constitute discrimination against Plaintiffs.

159.    Defendants, through the operation every Maryland prison, offer programs, services, and activities to prisoners, such as an administrative grievance process, work programs, diminution credits, education programs, vocational training, inmate housing, and counseling. Defendants' programs, services, and activities are offered as means to help prisoners transition into society and provide useful skills that allow newly released prisoners to be self-reliant upon release. These programs and activities are also essential in reducing the potential for recidivism.

160.    Plaintiffs, as individuals with disabilities or perceived disabilities, are individuals specifically contemplated by Section 504.

161.    As prisoners committed to DPSCS custody, Plaintiffs are eligible to participate in and receive the benefits of each of these services, programs, or activities. *Id.* § 42.540(l)(2).

[42]

162.   As described herein, Defendants deny Plaintiffs equal access to and benefits from services, programs, and activities because of Plaintiffs' disabilities or perceived disabilities. Defendants fail to equally extend DPSCS' vocational training and work release programs to Plaintiffs, causing Plaintiffs to lost the opportunity to work and earn money while incarcerated.

163.   Defendants further discriminate against Plaintiffs because of their disabilities or perceived disabilities when they relegate them to jobs that provide lower pay and fewer diminution credits based on stereotypes about their abilities as disabled individuals.

164.   Defendants also discriminate against Plaintiffs because of their disabilities or perceived disabilities by failing to provide them with the necessary medical care and devices that they require, and by refusing to properly house Plaintiffs in accommodations that are specifically designed and equipped for disabled individuals. Retaliation by Defendants and their agents and employees against Plaintiffs and other prisoners who assist Plaintiffs with the myriad difficulties they face because of Defendants' noncompliance also constitutes discrimination against Plaintiffs because of their disability.

165.   Defendants also deny Plaintiffs the ability to obtain meaningful work release assignments, despite the Plaintiffs being classified for same. Indeed, DPSCS's employees and agents, including its medical personnel, are complicit with Defendants' refusals as medical staff routinely deny Plaintiffs medical clearance to participate in programs and services for which they are otherwise eligible, citing Plaintiffs' disabilities as the sole reason for denial.

166.   Plaintiffs have suffered physical injuries as a direct and proximate cause of Defendants' discrimination.

167.   Moreover, Plaintiffs have lost the opportunity to receive wages, diminution credits, and vocational training and will continue to experience these losses upon release. On information

and belief, this discrimination has and continues to cause disabled prisoners, like Plaintiffs, to remain incarcerated for longer terms of confinement than non-disabled prisoners.

168.     Defendants have retaliated against Plaintiffs by revoking or restricting their privileges, harassing them, threatening to confiscate their property, refusing to discuss these ongoing issues with them, and by threatening to transfer them to even less compliant Maryland prison facilities.

169.     Defendants' failures to provide equal access to their services, benefits, activities, programs, privileges, and to provide reasonable modifications and accommodations, are policies, regular practices, and/or customs of the Defendants.

170.     Defendants' continued failure to comply with the Rehabilitation Act has caused, and will continue to cause, harm to Plaintiffs.  Plaintiffs will continue to be harmed unless and until Defendants are ordered by this Court to make modifications to their policies, practices, procedures, and facilities pursuant to Section 504.

171.     Defendants' pattern, practice, and deliberate indifference as described herein has proximately caused harm to individuals with disabilities in DPSCS custody, and Plaintiffs have suffered, and continue to suffer from harm and violations of their rights under the Rehabilitation Act.  These harms will continue if not enjoined by this Court.

172.     Accordingly, Plaintiffs are entitled to compensatory damages and such other and further relief as demanded herein.

### COUNT III

**(42 U.S.C. § 1983 – Subjecting Plaintiffs to Serious Harm and a Substantial Risk of Serious Harm in Violation of the Eighth Amendment)**

**(Defendants Green, Moyer, Hill, Corcoran, Acuff, Campbell, Graham, and Scruggs)**

The previous paragraphs are incorporated as if fully stated herein.

[44]

173.    The Eighth Amendment to the United States Constitution, which is incorporated against the states by the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

174.    Plaintiffs bring suit pursuant to 42 U.S.C. § 1983 to seek redress for Defendants' infliction of cruel and unusual punishments. Defendants fail to make reasonable accommodations to their policies and procedures or to provide Plaintiffs auxiliary aids or services to allow Plaintiffs to safely navigate DPSCS facilities, and to access the jobs, programming, and services available to other non-disabled prisoners.

175.    Defendants also refuse to consider Plaintiffs' disabilities in housing, work, recreation, programming, and other areas all of which severely limit, if not bar entirely, Plaintiffs from participating in activities of daily living that are available to their non-disabled peers. Defendants refuse to make reasonable accommodations despite Plaintiffs' multiple written requests and grievances.

176.    Defendants are aware of the harms and risks created by their policies and/or the way their policies are implemented, and have refused to make reasonable accommodations to DPSCS facilities or policies.

177.    Defendants were personally involved in the alleged constitutional and statutory violations in that each of them:  (a) directly participated in the infraction; (b) failed to remedy the wrong after learning of the violation through written complaints and grievances; (c) created a policy or custom under which unconstitutional and unlawful practices occurred; (d) allowed such a policy or custom to continue; (e) ignored the longstanding pattern of ADA noncompliance; and (f) was deliberately indifferent in both their own conduct and in managing their subordinates, which indifference caused the constitutional violations described herein.

178.     Plaintiffs have sustained, and continue to suffer serious and unreasonable risks of

harm by the conduct of the Defendants, including but not limited to, physical injury, humiliation,

disruption of their relationships with their loved ones, severe anxiety and emotional distress,

extended terms of confinement because they are unable to earn diminution credits as they should,

financial hardships, and other ongoing failures as described herein.

179.     Plaintiffs have been harmed by the conduct of Defendants and are each entitled to

compensatory and punitive damages.

## COUNT IV

### (42 U.S.C. § 1983 – Constitutional Denial of Due Process in Failing to Train and/or Supervise)

### (Defendants Green, Moyer, Hill, Corcoran, Acuff, Campbell, Graham, and Scruggs)

The previous paragraphs are incorporated as if fully set forth herein.

180.     As the Plaintiffs were persons in the custody of Defendants Green, Moyer, Hill,

Corcoran, Acuff, Campbell, Graham, and Scruggs, a special relationship existed between these

Defendants and the Plaintiffs that required the Defendants to provide protection and assistance to

the Plaintiffs.

181.     Defendants Green, Moyer, Hill, and Corcoran are policymakers for DPSCS and in

that capacity establish policies, procedures, customs, and/or practices for DPSCS and DOC

regarding the housing and conditions of confinement of prisoners and the conduct of its staff.

Defendants Acuff, Campbell, Graham, and Scruggs are responsible for implementing DPSCS

policies and regulations at their particular prison facilities, and for supervising DPSCS staff

therein.

182.     Defendants Green, Moyer, Hill, Corcoran, Acuff, Campbell, Graham, and Scruggs

developed and maintained policies, procedures, customs, and/or practices regarding the treatment

of prisoners with disabilities that exhibit a deliberate indifference to the constitutional rights of

such prisoners, as these Defendants knew that such policies routinely deprived the Plaintiffs, and those similarly situated, of their constitutional rights.

183.    Defendants Green, Moyer, Hill, Corcoran, Acuff, Campbell, Graham, and Scruggs failed to properly train and supervise DPSCS staff with respect to reasonable accommodations for disabled prisoners, the legal requirements for physical and auxiliary accommodations for such disabled prisoners, and properly responding to disabled prisoners' complaints about the inadequacy, or like here, the complete absence of such accommodations.

184.    Defendants Green, Moyer, Hill, Corcoran, Acuff, Campbell, Graham, and Scruggs were deliberately indifferent in failing to provide the requisite training and supervision to DPSCS staff, or the requisite protection and assistance to the Plaintiffs.

185.    Defendant Green, Moyer, Hill, Corcoran, Acuff, Campbell, Graham, and Scruggs' failures caused harm to the Plaintiffs, as described herein.

## COUNT V

### (Violations of Articles 16 and 25 of the Maryland Declaration of Rights)

### (Against All Defendants)

The previous paragraphs are incorporated as if fully set forth herein.

186.    At all relevant times, each Defendant was acting under the color of state law as departments, officers, and employees of the State of Maryland, and their acts and/or omissions were conducted within the scope of their official duties or employment.

187.    As described herein, Defendants' acts and omissions deprived the Plaintiffs of their rights under the Maryland Declaration of Rights, Articles 16 and 25, to be free from cruel and unusual punishment.

188.    The acts and omissions described herein caused injuries to the Plaintiffs.

[47]

189.    At all relevant times, Defendants were acting pursuant to DPSCS custom, policy, authority, decision, ordinance, regulation, widespread habit, usage, or practice in their actions toward the Plaintiffs.

190.    As a direct and proximate result of Defendants' conduct, as described herein, the Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses, some of which may be continuing in nature, thereby entitling Plaintiffs to compensatory and special damages.

191.    Plaintiffs are therefore entitled to money damages to compensate them for their injuries and for the violation and deprivation of their rights under the Maryland Declaration of Rights.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grants the following relief as to Counts I through V:

A.      Enjoin Defendants from denying Plaintiffs equal and effective access to the grievance process, library, work programs, educational and vocational programs, building facilities, medical facilities, and to safe housing;

B.      Enjoin Defendants from denying the Plaintiffs proper housing accommodations that can adequately accommodate their disability;

C.      Enjoin Defendants from retaliating against Plaintiffs for engaging in protected activity under the Americans with Disabilities Act and/or Rehabilitation Act;

D.      Enjoin Defendants to award Plaintiffs diminution credits toward their release in an amount commensurate with Plaintiffs' lost opportunities to earn such credits through work, educational, or training programs as a result of Defendants' discriminatory actions;

E.      Enjoin Defendants from transferring prisoners with disabilities to ADA noncompliant prison facilities or institutions;

F.      Award compensatory damages to each Plaintiff;

G.      Award punitive damages in an amount to be determined at trial;

H.      Award Plaintiffs, pursuant to 42 U.S.C. § 1988, their costs, expert witness fees, and attorneys' fees in this action; and

I.      Grant any and all additional relief that Plaintiffs' causes require.

## COUNT VI

### (Negligence)

### (Plaintiff Karl Rogers against Defendants DPSCS and Scruggs)

Plaintiff Rogers incorporates the previous paragraphs as if fully set forth herein.

192.    Defendants DPSCS and Scruggs owed a duty to Mr. Rogers arising out of their special relationship with him to protect him against unreasonable risk of physical harm.

193.    Defendants DPSCS and Scruggs knew that MRDCC was not ADA-compliant because it did not have handicapped showers, handrails, anti-slip guards, or shower chairs for disabled prisoners, like Mr. Rogers. In sum, Defendants DPSCS and Scruggs knew that prisoners, like Mr. Rogers, faced an unreasonable risk of physical harm.

194.    Defendants DPSCS and Scruggs breached this duty by ignoring MRDCC's ADA noncompliance, and by allowing MRDCC staff to force Mr. Rogers to **hop on one leg** in and out of the shower facilities on wet floors, and to prohibit Mr. Rogers to bring his forearm crutches or any other assistive devices into the shower with him. Even if Defendants DPSCS and Scruggs did not intentionally ignore these practices and this behavior, they nevertheless breached the duty owed to Mr. Rogers by failing to intervene after becoming aware of these impermissible practices.

195.    These avoidable breaches caused Mr. Rogers to fall as he exited the shower on January 3, 2019, which fall caused Mr. Rogers to sustain several tears in his right shoulder, and other physical injuries.

[49]

WHEREFORE, Plaintiff Karl Rogers prays for judgment in his favor and against Defendants DPSCS and Scruggs, jointly and severally, in the amount of Four Hundred Thousand Dollars ($400,000.00) as compensatory damages, costs, and such other and further relief that this Court deems appropriate.

Respectfully submitted,

**David Daneman**
**Thomas J. Whiteford**
**Erek L. Barron**
**Allen E. Honick**
**WHITEFORD, TAYLOR & PRESTON, L.L.P.**
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
(410) 347-8700
ddaneman@wtplaw.com
ahonick@wtplaw.com
***Counsel for Plaintiffs***

## DEMAND FOR JURY TRIAL

The above-captioned Plaintiffs respectfully request that this matter be heard by a jury.

Allen E. Honick

*10169022*